**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **LEE WARD, on behalf of himself and all others similarly situated,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:14-CV-8 (HL) |
| **DICKINSON FINANCIAL CORP. II, INC., DICKINSON FINANCIAL CORP., BANK MIDWEST, N.A.,[1] ARMED FORCES BANK, N.A., ACADEMY BANK, N.A., ARMED FORCES BANK OF CALIFORNIA, N.A., SOUTHERN COMMERCE BANK, N.A., SUNBANK, N.A., and FISERV, INC.,** | |
| Defendants. | |

**ORDER**

Before the Court are the following motions submitted by Defendants: (1)

Motion to Dismiss Defendants Dickinson Financial Corporation II, Inc., Dickinson

Financial Corporation, Armed Forces Bank, N.A., Armed Forces Bank of

California, N.A., Academy Bank, N.A., and Southern Commerce Bank, N.A. (Doc.

---

[1] Bank Midwest, N.A. ("Bank Midwest") was a formerly chartered bank held by Dickinson Financial Corporation. In 2010, the bank was dissolved. Half of the bank's branches were sold to NBH Holdings Corp.; the other half merged with Armed Forces Bank. (Doc. 22 ¶ 29; Doc. 64, pp. 6-9). The record contains no evidence that Plaintiff ever issued a summons to Bank Midwest or that Bank Midwest either was served or returned an executed waiver of service. More than a year has transpired since the filing of Plaintiff's Complaint. The Court therefore dismisses Bank Midwest as a party to this action pursuant to Federal Rule of Civil Procedure 4(m).

31); (2) Motion to Dismiss Defendant SunBank, N.A. (Doc. 32); and (3) Motion to Dismiss Fiserv, Inc. (Doc. 30). The Court held a hearing on these motions on October 9, 2014. For the following reasons, Defendants' motions are granted.

## I.  BACKGROUND

Plaintiff Lee Ward, a citizen of the State of Arizona, opened a personal checking account ending in "0145" at SunBank, N.A. ("SunBank"), which is headquartered in Phoenix, Arizona and conducts business exclusively in Arizona, in June 2008. Ward alleges that during the life of this account, SunBank assessed numerous overdraft fees without proper notice to Ward and in violation of the Account Terms and Conditions ("Account Agreement") governing the account. (Doc. 22-1). Ward claims that while he knew that the bank would charge an overdraft fee when his account did not contain sufficient funds to cover a check, he was unaware that the same fees applied when he made transactions through use of his debit card either at an ATM machine or a point of sale without adequate funds to cover the purchases or withdrawals. He states that the bank knowingly approved these electronic transactions even though his account balance was deficient. Ward additionally alleges that SunBank charged overdraft fees on his deposits.

Ward was aware that the overdraft fees were being charged to his account. He admits that he "often challenged bank personnel about the fees." (Doc., ¶ 94). However, he claims that the bank employees were unable to explain

the fees, though the bank did agree to refund some of the fees. (Doc. 22, ¶ 89). Ward avers that the bank's overdraft policies were less than transparent and created impediments to avoiding future fees even if the customer kept track of his account balance. He ultimately closed the checking account sometime in November 2010.

Ward, as representative of a putative class, now asserts state law claims for breach of contract, breach of the covenant of good faith and fair dealing, unconscionability, unjust enrichment, and conversion for alleged violations of his Account Agreement with SunBank against not only SunBank, but also against Dickinson Financial Corporation ("DFC"), a holding company for the other named bank defendants, Armed Forces Bank, N.A. ("AFB"), Armed Forces Bank of California, N.A. ("AFBCA"), Academy Bank, N.A. ("Academy Bank"), and Southern Commerce Bank, N.A. ("Southern Commerce Bank"), and Dickinson Financial Corporation II, Inc. ("DFC II"), a registered multi-bank holding company that owns and controls DFC. Ward also contends that the banking Defendants collectively conspired with Defendant Fiserv, Inc. ("Fiserv"), a banking consultant, to maximize the accumulation of overdraft fee income by assessing improper fees against customers in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d).

## II.     STANDARDS OF REVIEW

Defendants move to dismiss Plaintiff's Complaint on numerous procedural and substantive grounds, putting into play three different potential standards of review: Rule 12(b)(1), Rule 12(b)(2), and Rule 12(b)(6).

### A.     Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)

A Rule 12(b)(2) motion to dismiss attacks the district court's ability to assert jurisdiction over the defendant's person. Fed.R.Civ.P. 12(b)(2). Where a Rule 12(b)(2) motion to dismiss is decided without an evidentiary hearing, a Plaintiff seeking to exercise "personal jurisdiction of a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir. 2010) (quoting United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009)). A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1291 (11th Cir. 2000). The district court must accept as true the facts alleged in the complaint. Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

"A court without personal jurisdiction is powerless to take further action." Posner v. Essex Ins. Co., 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) (citing to Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) (declaring that

a court should decide a 12(b)(2) motion before a 12(b)(6) motion because "a court without [12(b)(2)] jurisdiction lacks power to dismiss a complaint for failure to state a claim")). Accordingly, the Court will address any pending issues of personal jurisdiction first.

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The motion may be based upon either a facial or factual challenge to the complaint. McElmurray v. Consol. Gov't of Augusta-Richmond Cty., 501 F.3d 1244, 1251 (11th Cir. 2007). In the case of a facial attack, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." Id. (quoting Williams v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981)). The district court is required "merely to look and seek if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980)).

When a Rule 12(b)(1) attack is factual, however,

> the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to

weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Id. (quoting Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

### C.     Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6)

When examining a motion to dismiss, the court shall accept "all well-pleaded facts . . . as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271,1273 n. 1 (11th Cir. 1999). The court must dismiss the complaint if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citing Executive 100, Inc. v. Martin County, 992 F.2d 1536, 1539 (11th Cir. 1991) and Bell v. Hood, 327 U.S. 678, 682 (1946)). To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The plaintiff is required to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6

alleged." Id. While there is no probability requirement at the pleading stage, "something beyond . . . mere possibility . . . must be alleged." Twombly, 550 U.S. at 557 (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). This standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. Id. at 556. Rule 12(b)(6) does not permit dismissal of a complaint "simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 556).

## III.   DEFENDANTS' MOTION TO DISMISS DEFENDANTS DFC II, DFC, AFB, AFBCA, ACADEMY BANK, AND SOUTHERN COMMERCE BANK (DOC. 31)

Defendants move to dismiss the two bank holding companies, DFC and DFC II, as well as AFB, AFBCA, Academy Bank, and Southern Commerce Bank, alleging that the Court has no authority to exercise personal jurisdiction over these nonresident Defendants. Alternatively, Defendants argue that Plaintiff's Amended Complaint should be dismissed for lack of subject matter jurisdiction because Plaintiff has not alleged any injury-in-fact attributable to these entities and thus has no standing to bring his claims. The Court agrees that it lacks personal jurisdiction over DFC, DFC II, AFBCA, Academy Bank, and Southern Commerce Bank. While the Amended Complaint contains sufficient allegations to determine that AFB, which maintains a single branch bank in Valdosta, Georgia, marginally satisfies the minimum contacts test required to comport with due

7

process, the Court finds that Plaintiff lacks standing to bring any claims against a bank with which he did not contract and by which he cannot show he was injured.

## A.    Personal Jurisdiction over DFC and DFC II

A district court sitting in diversity must undertake a two part inquiry to determine the existence of personal jurisdiction: (1) whether the applicable statute confers jurisdiction over the defendant; and (2) whether the exercise of jurisdiction comports with due process. Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 942 (11th Cir. 1997). Here, the parties agree that Plaintiff's invocation of the federal RICO statute, which provides for nationwide service in any judicial district in which the defendant is found, meets the requirements of the first prong of the personal jurisdiction analysis. See 18 U.S.C. § 1965(d). The Court therefore will focus on whether or not exercising personal jurisdiction over the two bank holding companies satisfies the constitutional requirements of due process.

The due process analysis is twofold. First the court must determine whether the nonresident defendant has "minimum contacts" with the forum jurisdiction, which in this case is Georgia. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-74 (1985). Critical to the due process inquiry "is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." Id. at 474 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). If the court

finds sufficient minimum contacts exist, the court then must decide whether the exercise of personal jurisdiction would offend the "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Jurisdiction is proper where the defendant's proximate contacts with the forum result from his own actions and not solely as a result of "random," "fortuitous," or "attenuated" contacts, or the unilateral activity of another party or a third person. Burger King, 471 U.S. at 475.

Plaintiff contends that the contacts of AFB, which operates a single branch at Moody Air Force Base in Valdosta, Georgia, should be imputed to DFC and DFC II, both of which are headquartered in the State of Missouri and otherwise have no contacts with Georgia, to establish personal jurisdiction based on the theory that the subsidiary bank functions as nothing more than an alter ego of the two bank holding companies. Plaintiff argues that the holding companies exert such a level of ownership and control over their subsidiary banks that the individual banks and the holding companies essentially function as one entity.

As a general principle, as long as a parent and subsidiary are separate and distinct corporations, "a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." Consol., 216 F.3d at 1293 (11th Cir. 2000). "Where the 'subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the

parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary.'" Id. "'On the other hand, if the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for the purposes of asserting personal jurisdiction.'" Meir v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1272 (11th Cir. 2002) (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed. 2002)). Thus, in order to make out a prima facie case that the parent so controlled the activities of the subsidiary such that personal jurisdiction over the subsidiary should be attributed to the parent corporation, the plaintiff must show that the subsidiary's existence was a mere formality and that the subsidiary serves only as the parent's agent. Vogt v. Greenmarine Holding, LLC, 2002 U.S. Dist. LEXIS 21013, at *22 (N.D. Ga. Feb. 20, 2002); see also Christie v. Bank of America, N.A., 2014 WL 5285987, at *6 (M.D. Fla. Oct. 15, 2014) (finding allegations that the holding company was an alter ego of the subsidiary bank because the holding company conducted, managed, and controlled the bank's affairs and was both directly and indirectly involved with the wrongful actions of the bank to be conclusory and insufficient to disregard the corporateness of the subsidiary).

10

Defendants DFC and DFC II are bank holding companies formed under the requirements of the Bank Holding Company Act of 1956, 12 U.S.C. § 1841. As defined by the Act, "bank holding company" means "any company which has control over any company that is or becomes a bank holding company by virtue of this Act." 12 U.S.C. § 1841(a)(1). The Act describes "control" to include ownership and control of a bank's stock, involvement in the election of directors or trustees of the bank, or direct or indirect influence over the management or policies of the bank. 12 U.S.C. § 1841(a)(2). A holding company is not a bank. Banks are independently chartered entities under the National Bank Act whose activities as depository and lending institutions are governed by different laws and regulations.

As alleged in Plaintiff's Amended Complaint, DFC, a Missouri corporation, is a bank holding company for Academy Bank, AFB, AFBCA, SunBank, and Southern Commerce Bank. (Doc. 22, ¶ 25). DFC II, also a Missouri corporation, is a registered multi-bank holding company. (Doc. 22, ¶ 24). DFC II owns and controls DFC. (Doc. 22, ¶ 24). One of the banks held by DFC, AFB, operates a single branch on Moody Air Force Base. While Plaintiff admits that the individual banks held by DFC are all separately chartered and have separate boards of directors (Doc. 64, p. 42), Plaintiff argues that in reality the banks serve only as alter egos for the holding companies, which control the policy making and operations of the subsidiary banks. The blurring of the corporate forms thus

11

makes it appropriate for the court to exercise personal jurisdiction over the bank holding companies based on one of the subsidiary banks' contacts with the forum state.

Plaintiff's factual allegations concerning the extent of the control wielded by DFC and DFC II over the individual banks are limited. First, Plaintiff generally asserts that DFC owns and controls the individual banks, and DFC II in turn owns and controls DFC. (Doc. 22, ¶¶ 24-25). Plaintiff also shows that the banks, while "somewhat distinct retail banking brands," operate on a unified operating platform implemented by DFC, meaning they employ the same computer system that uniformly manages day to day bank activities, including the assessment and collection of overdraft fees (Doc. 22 ¶¶ 5, 48). Plaintiff further alleges that "Defendants' methodologies for generating overdraft fees are substantively identical across all brands." (Doc. 22, ¶ 5). And, at the end of the day, the holding companies are the ultimate beneficiaries of the subsidiary banks' profits from any fees. (Doc. 22, ¶ 5).

At the hearing on Defendants' motions to dismiss held on October 9, 2014, the Court questioned Plaintiff's counsel about the issue of control. (Doc. 64, pp. 38-47). Plaintiff emphasized again and again the importance of the uniform operating procedures and technology purchased from Fiserv and implemented by DFC into each of the subsidiary banks as evidence of control "[b]ecause all the same rules, practices, and procedures for how transactions were to be

12

handed [sic] were done on one system." (Doc. 64, p. 44). However, as the Court

noted at that time and reiterates now,

> a holding company tries to make all of its subsidiary banks more efficient by the employment of common systems. I mean, you know, they may all use the same form note. They may all use the same form contract for the creation of deposit accounts. They may all use a common computer to keep up with their loans and who is behind and who is ahead. All of those things. But in my observation that doesn't create control in the sense that you seemed to be talking about. It's also obvious and plainly true that the holding company controls all of the small banks. Most holding companies own the majority of the stock in the banks that they control.

(Doc. 64, p. 45).

Plaintiff points to several cases from various jurisdictions in an effort to distinguish the facts of this case from others where courts have held that there were not sufficient facts alleged to demonstrate that a subsidiary corporation was a mere alter ego of the parent corporation for the purpose of determining personal jurisdiction. For example, Plaintiff cities to Hargrave v. Fibreboard Corp., a Fifth Circuit decision involving asbestos litigation that required the court to consider whether there was sufficient evidence that a parent corporation maintained the level and degree of control necessary to fuse the two entities together under an alter ego theory to warrant extending personal jurisdiction under the Texas long-arm statute. 710 F.2d 1154 (5th Cir. 1983).

As the Fifth Circuit pointed out, the difficulty in determining whether two corporate entities function as one for the purposes of jurisdiction is "in articulating

the type and degree of control necessary to ascribe to a parent the activities of its subsidiary." Id. at 1159. Examining the analysis in Canon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333 (1925), the court noted the Supreme Court's ultimate instruction "that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." Id. at 1160 (internal citation omitted). Generally, stock ownership and commonality of officers is not enough to create an alter ego relationship. Id. "The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship. All the relevant facts and circumstances surrounding the operations of the parent and subsidiary must be examined to determine whether two separate and distinct entities exist." Id.

The Hargrave court went on to discuss characteristics of the corporate relationship at play before it. Specifically, the court found that the parent corporation had complete authority over general policy decisions of the subsidiary, including selection of product lines, hiring and firing of the subsidiary's corporate officers, and approval of capital investments. Id. at 1160. The subsidiary managed its own day to day business and operational decisions. Id. In the end, the court determined that these factors were not enough to create alter ego jurisdiction: "T & N and K & M maintained a degree of corporate separation that was more than superficial; they were two separate corporations joined by the

14

common bond of stock ownership. The policymaking authority held and exercised by T & N was no more than that appropriate for a sole shareholder of a corporation, and certainly not enough to warrant the extraterritorial exercise of jurisdiction over that shareholder under the Texas statute." Id. at 1161.

Plaintiff claims that the facts here are distinguishable from those described in Hargrave. Plaintiff contends that he has adequately alleged that the bank holding companies and the individual banks operate as one economic enterprise controlled exclusively by the holding companies. Moreover, Plaintiff professes that this case is more closely aligned with several lawsuits filed against Synovus Bank. See Griner v. Synovus Bank, 818 F. Supp. 2d 1338 (N.D. Ga. 2011) (identifying Synovus as the sole defendant doing business under the trade names of its multiple bank divisions); Childs v. Synovus Bank (In re Checking Account Overdraft Litig.), 883 F. Supp. 2d 1244, 1249, 50 (S.D. Fla. 2011) (locally branded division of Synovus dismissed because not a separate legal entity capable of being sued); Stillion v. United Bank, Inc. and United Bankshares, Inc., Case No. 1:11-CV-21472-JLK (S.D. Fla. July 25, 2012) (denying motion to dismiss based on a finding that there were no exceptions to jurisdiction under the Class Action Fairness Act of 2005). Plaintiff cites to these cases for the proposition that other courts have permitted plaintiffs to pursue litigation against both a parent company and its regionally-branded banks.

However, as Defendant points out, the cases highlighted by Plaintiff do not advance the argument posed by Plaintiff. The Court agrees.

Plaintiff's conclusory allegations that the two bank holding companies control the subsidiary banks' operations through the implementation of standard policies and procedures and technology are insufficient for the Court to disregard corporate formalities and to impute personal jurisdiction. Plaintiff alleges that the bank holding companies have put standard practices into place and nothing more. Plaintiff has not pled any facts to suggest that the holding companies were directly engaging in the business of banking or that the holding companies in any capacity participated in the collection of overdraft fees beyond providing the bank with a mechanism to do so. As the court found in Hargrave, the policymaking authority exercised by the holding companies here "was no more than that appropriate for a sole shareholder of a corporation, and certainly not enough to warrant the extraterritorial exercise of jurisdiction." 710 F.2d at 1161. The Court accordingly dismisses Plaintiff's claims against DFC and DFC II for lack of personal jurisdiction.

**B.   Personal Jurisdiction over AFBCA, Academy Bank, and Southern Commerce Bank**

The Court, likewise, does not have the authority to exercise personal jurisdiction over AFBCA, Academy Bank, or Southern Commerce Bank. AFBCA is headquartered in San Diego, California and operates its eight branches

exclusively in California. (Doc. 22, ¶ 27). Academy Bank is headquartered in Colorado Springs, Colorado, and conducts business only in Colorado. (Doc. 22, ¶ 28). Southern Commerce Bank is headquartered in Tampa, Florida and maintains several branches throughout Florida. Plaintiff alleges no facts to indicate that any of these banks transact business or have any contacts in Georgia. Under the circumstances, the Court cannot find that that these entities have sufficient minimum contacts to justify jurisdiction. To find otherwise would not be consistent with due process. AFBCA, Academy Bank, and Southern Commerce Bank are, therefore, dismissed for lack of personal jurisdiction.

### C.    Standing to Bring Claims against AFB

AFB is the only entity alleged by Plaintiff to have any direct contact with Georgia. As discussed above, AFB maintains a single branch bank located on Moody Air Force Bank in Valdosta, Georgia. While the Court may exercise personal jurisdiction over this particular bank, the Court finds that it lacks subject matter jurisdiction to entertain Plaintiff's claims against AFB because Plaintiff has not pled facts sufficient to establish standing to bring any of his state law claims against this bank.

"[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claim." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005) (quoting Dillard v. Baldwin Cty. Comm'rs, 225 F.3d 1271, 1275 (11th Cir. 2000)). A claim cannot proceed in

federal court if the plaintiff does not have standing. <u>Valley Forge Christian Coll. v. Am. United for Separation of Church & State</u>, 454 U.S. 464, 471 (1982). To establish standing, a plaintiff must show: (1) that he suffered an injury in fact; (2) the injury was causally connected to the defendant's action; and (3) the injury will be redressed by a judgment in the plaintiff's favor. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

The plaintiff must allege that he personally suffered injury. <u>Griffin v. Dugger</u>, 823 F.2d 1476, 1482 (11th Cir. 1987). This requirement does not change where the plaintiff claims to be representing a class. <u>Id</u>. at 1483. The plaintiff still must demonstrate a case or controversy between himself and each of the defendants. <u>Id</u>. "It is not enough that the conduct of which the plaintiff complains will injure someone. The complaining party must also show that he is within the class of persons who will be concretely affected." <u>Id</u>. Simply put, a plaintiff cannot represent a class of which he is not a member. <u>Christiansen v. Beneficial Nat'l Bank</u>, 972 F. Supp. 681, 683 (S.D. Ga. 1997) (finding that plaintiffs, who had not personally obtained loans from three of the named defendant banks but purported to represent class members who had did, not have standing to sue those defendants).

Defendants argue, and the Court concurs, that Plaintiff lacks standing to sue AFB, a bank with which Plaintiff pleads no contractual or any other type of relationship. Plaintiff alleges that he was a customer of SunBank only and that

SunBank alone assessed overdraft fees against his checking account. Thus dismissal of Plaintiff's claims against AFB is appropriate.

## IV.   DEFENDANTS' MOTION TO DISMISS DEFENDANT SUNBANK (DOC. 32)

Defendants move to dismiss Plaintiff's claims against SunBank for lack of personal jurisdiction. As with the other entities previously discussed, Defendant argues that Plaintiff has failed to establish that SunBank had minimum contacts with the State of Georgia such that the bank reasonably could anticipate being haled into court here. Plaintiff offers no additional evidence to rebut Defendants' arguments and instead incorporates by reference his prior response in which he premises personal jurisdiction over SunBank on SunBank's relationship with DFC and DFC II. The Court has already determined that Plaintiff failed to make out a prima facie case that the holding companies and the banks are alter egos of one another for the purposes of personal jurisdiction. The Court therefore must examine its jurisdictional reach over SunBank individually.

"Considerations of due process require that a non-resident defendant have certain minimum contacts with the forum, so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." Sherritt, 216 F.3d at 1291 (citing Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc., 786 F.2d 1055, 1057 (11th Cir. 1996)). The nature of the contacts may vary depending on the type of personal jurisdiction asserted. Id. "Specific jurisdiction

arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint." Id. In contrast, general jurisdiction may arise of contacts with the forum state that are unrelated to litigation; however, there must be "a showing of continuous and systematic general business contacts between the defendant and the forum state." Id. at 1292.

Plaintiff here has pled no facts to suggest that SunBank has conducted any business in the State of Georgia. As alleged by Plaintiff, SunBank is headquartered in Phoenix, Arizona and maintains 12 branches exclusively in the State of Arizona. (Doc. 22, ¶ 31). The Court has no authority to exercise personal jurisdiction over this Defendant. SunBank therefore is dismissed as a party to this lawsuit for lack of personal jurisdiction.

## V.   DEFENDANTS' MOTION TO DISMISS DEFENDANT FISERV (DOC. 30)

In their remaining motion, Defendants move to dismiss Plaintiff's RICO claims against Defendant Fiserv. Plaintiff alleges that Fiserv, a technology services provider for financial institutions, conspired with DFC and DFC II to commit criminal acts of wire fraud, mail fraud, and bank fraud in constructing a system that allowed the banks to permit customers to overdraft their accounts through use of their debit cards and then charging a fee. As a threshold matter, Defendant argues that Plaintiff's RICO and RICO conspiracy claims are barred by the statute of limitations.

The RICO statute does not include an express statute of limitations; however, the Supreme Court has held that RICO's civil enforcement provisions are subject to a four year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 152-53 (1987). "The civil RICO limitations period runs from the moment a diligent plaintiff discovered an injury to itself, not from the time it discovered the pattern of predicate acts." Curtis Inv. Co., LLC v. Bayerische Hypo-Und Vereinsbank, AG, 2007 U.S. Dist. LEXIS 94012, at *28-29 (N.D. Ga. Dec. 20, 2007) (citing Rotella v. Wood, 528 U.S. 549, 558-59 (2000)). Dismissing a claim as barred by the statute of limitations "is appropriate only if it is apparent from the face of the complaint that the claim is time barred," and then "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1288 and n.13 (11th Cir. 2005).

Here, Plaintiff opened his account at SunBank in June 2008. (Doc. 22, ¶ 22). Plaintiff alleges that he was injured as a result of the RICO enterprise, which undertook to devise a system of assessing improper overdraft fees on debit card transactions. (Doc. 22, ¶¶ 144-45, 153, 157-63; Doc. 55, RICO Interogg. 1, ¶¶ 1, 8-10; RICO Interoggs. 2, 10). Plaintiff's Amended Complaint sets forth numerous occasions when SunBank charged an overdraft fee to his account after Plaintiff made a purchase or ATM withdrawal without sufficient funds. (Doc. 22, ¶¶ 94-102). The first instance of conspiratorial conduct alleged

by Plaintiff occurred in July 2009, when Plaintiff used his debit card to make a $171.86 purchase at Home Depot. (Doc. 22, ¶ 95). Because the transaction went through at the point of sale, Plaintiff believed his account contained enough money to cover the purchase. (Id.). It did not, and the bank assessed a fee. Plaintiff goes on to describe five other examples throughout 2009 when the bank as a part of the ongoing conspiracy allegedly charged improper overdraft fees against his account. (Doc. 22, ¶¶ 98-102). The last fees alleged occurred in May and June 2010. (Doc. 22, ¶ 94). Plaintiff closed his account sometime in November 2010. (Doc. 22, ¶ 22).

Plaintiff does not deny knowledge of the overdraft fees. He noted the charges on his account statements, and often challenged the bank about the fees. (Doc. 22, ¶ 94). Plaintiff further admits that the bank on occasion refunded the fees. (Doc. 22, ¶ 89). Rather, Plaintiff contends that the bank, along with the other Defendant financial institutions, conspired with Fiserv to conceal that the bank would permit Plaintiff to use his debit card in excess of his account balance by converting the debit card into a credit card for the exclusive purpose of maximizing fee profits.

Defendant claims that Plaintiff either knew or should have discovered by 2009 that SunBank was assessing overdraft fees on his debit card transactions. The four year statute of limitations therefore began to run in 2009. Since Plaintiff

22

did not file this lawsuit until January 21, 2014,[2] his claims for violations of RICO and RICO conspiracy are barred by the statute of limitations. Plaintiff disagrees with Defendants' calculation and argues that the separate accrual doctrine applies, thereby restarting the clock for each new predicate act or, alternatively, that the statute should be equitably tolled based on Defendant's concealment of "the true nature of the overdraft fees from him through misleading communications." (Doc. 50, p. 12).

## A. Separate Accrual

"[T]he limitations period for a civil RICO action begins to run when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be a part of a pattern of racketeering." Maiz v. Virani, 253 F.3d 641, 676 (11th Cir. 2001) (citing Rotella, 528 U.S. at 1080) (rejecting both the injury and pattern discovery rule and the "last predicate act" rule). The separate accrual rule "provides that if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act." Lehman v. Lucom, 727 F.3d 1326, 1331 (11th Cir. 2013). The limitations period is only affected if the later act inflicts a "new and independent injury rather than merely an accumulating injury on the plaintiff."

---

[2] Plaintiff raised his RICO and RICO conspiracy claims in his Amended Complaint filed on March 31, 2014. For the purposes of this analysis, however, the Court will assume that Plaintiff's RICO claims were made retroactive to the date of the original Complaint. See Pilkington v. United Airlines, 112 F.3d 1532, 1535 (11th Cir. 1997).

Pilkington v. United Airlines, 112 F.3d 1532, 1537-38 (11th Cir. 1997). The plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997).

Plaintiff attempts to salvage his RICO claims by urging the Court to apply the separate accrual doctrine. As described in the Amended Complaint, Plaintiff alleges that in 2009 SunBank, through a surreptitious scheme devised by the Defendant banks and Fiserv, erroneously charged multiple overdraft fees against his account in violation of the Account Agreement. Any injury sustained during the 2009 time period clearly falls outside the applicable four year statute of limitations. However, Plaintiff also alleges that SunBank charged similar fees in May and June 2010. Plaintiff summarily states that "[e]ach improper fee is a new and independent injury and gives rise to a new RICO claim." (Doc. 50, p. 12). In so doing, Plaintiff accuses Defendants of a "fundamental misunderstanding of the separate accrual doctrine" (Doc. 50, p. 10), yet Plaintiff makes no attempt to explain how the fees charged in 2010 create a new injury rather than a cumulative injury caused by the originally purported predicate act as suggested by Defendants.

In the Court's opinion, the injury Plaintiff allegedly sustained each time the bank charged an overdraft fee is not a new and independent injury. Rather, each fee is part of a continuous injury resulting from the single fee-collecting scheme.

24

See Pilkington, 112 F.3d at 1537-38 ("The injury suffered by the plaintiffs has been a continuation of the initial injury that resulted from the harassment. With each act of harassment the adverse impact on the plaintiffs' job performance may accumulate, however, the injury is not new and independent."). Plaintiff's argument that that the statute of limitations does not bar his RICO claims based on the separate accrual doctrine therefore fails.

### B.    Equitable Tolling

While the principal of equitable tolling is germane to RICO cases, tolling is "the exception, not the rule." Pac. Harbor Capital, Inc. v. Barnett Bank, N.A., 252 F.3d 1246, 1252 (11th Cir. 2001). Equitable tolling "is defeated . . . when it is shown that indisputably the plaintiffs had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims." Id. (quoting Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 832 (11th Cir. 1999)). A "considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable." Id. (quoting Rotella, 528 U.S. at 556). But the "protection of the non-diligent plaintiff is not the rule in RICO cases." Id.

Plaintiff, again in a conclusory fashion, argues that the Court should find that his RICO claims were equitably tolled. Plaintiff alleges that Fiserv and the other Defendants concealed the "true nature" of the overdraft fees charged against Plaintiff's account through misleading communications. (Doc. 50, p.12).

25

Plaintiff claims that he had no knowledge of the fraud and that based on the information Defendants provided him it was impossible for him to discern which fees were proper and which were not.

Plaintiff admittedly knew that the bank was charging overdraft fees when he used his debit card. (Doc. 22, ¶¶ 89, 94). It is clear from the Amended Complaint that the fees themselves were in no way concealed, instead posting to Plaintiff's account within a day of each transaction and being published in Plaintiff's monthly account statements. (Doc. 22, ¶¶ 69, 72, 94-102). From the first time SunBank charged Plaintiff an overdraft fee as the result of a debit card transaction, Plaintiff was on notice to investigate the source and reason for the fee. It is clear from the face of the Complaint that Plaintiff admits to either calling or going into a local branch and discussing the fees with bank employees (Doc. 22, ¶¶ 89, 94), but he did nothing further and continued to use his debit card to make purchases and withdrawals to his detriment. It is indisputable that Plaintiff knew that the bank was charging overdraft fees and that he questioned at the time the bank's ability to assess those fees. It was incumbent upon him to investigate. His failure to do so prevents the application of the equitable tolling doctrine and requires the dismissal of Plaintiff's RICO claims as time barred.

## VI.   CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss. (Docs. 30, 31, 32).

**SO ORDERED** this 9th day of March, 2015.


*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**


aks